UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NINO DZGANIYA,<br><br>                             Plaintiff,<br><br>  - against -<br><br>COHEN HURKIN EHRENFELD POMERANTZ & TENENBAUM, LLP AND SIMILIS MANAGEMENT LLC,<br><br>                            Defendants. | Case No. _____<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Nino Dzganiya brings suit against Defendants Cohen Hurkin Ehrenfeld Pomerantz & Tenenbaum LLP (CHEPT) and Similis Management LLC (SM) for violating the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.* (as to CHEPT alone) and New York General Business Law § 349 (as to both Defendants). Defendants used false statements and coercive tactics against Plaintiff in a Housing Court non-payment eviction proceeding. Said tactics include: (a) sending a rent demand for putative arrears that are not owed, and that otherwise conceals the time period of the alleged arrears, *i.e.*, "rent-jamming;" (b) filing a petition for arrears that are not owed; (c) demanding attorney's fees in the petition when none are allowed; and (d) serving a motion to amend the petition on Plaintiff, despite knowing she was represented by counsel. Plaintiff seeks injunctive relief, statutory damages, actual damages, treble damages, punitive damages, attorney's fees, costs, and any further relief this Court deems appropriate.

### A.    JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction over the lawsuit under the FDCPA, 15 U.S.C. § 1692k(d), and 28 U.S.C. § 1331 because this dispute involves predominant issues of federal law.

2.  The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claim because it is so related to the claims within the Court's original jurisdiction that it forms part of the same case or controversy under Article 3 of the U.S. Constitution.

3.  Venue in this district is proper because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in New York County, New York.

4.  Plaintiff is an individual who resides in New York County, New York.

5.  Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because she was alleged to owe a debt.

6.  Defendant CHEPT is a law firm, a debt collector and a domestic limited liability partnership with its principal office at 25 Chapel Street, Suite 705, Brooklyn, New York 11201.

7.  CHEPT is a "debt collector" as defined in 15 U.S.C. § 1692a(6) because it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another, using the instrumentalities of interstate commerce.

8.  Upon information and belief, CHEPT regularly sends rent demands to tenants and has filed thousands of landlord-tenant proceedings based on allegations of nonpayment of rent.

9.  Defendant SM is a landlord and a domestic limited liability company with a New York State Department of State (DOS) process service address at C/O Englander, 1356 55th Street, Brooklyn, New York 11219.

### B. STATEMENT OF FACTS

10.  Plaintiff, Ms. Nino Dzganiya, 56, is a Georgian immigrant who works as a caregiver for families with children.

11.  In approximately May 2014, Plaintiff moved to a rent stabilized apartment located at 31

Bennett Avenue, Apartment 4, New York, New York 10033 (the apartment), where SM is the landlord (on information and belief).

12.     SM's head officer and managing agent is Chaim Englander.

13.     Plaintiff's initial rent stabilized lease commenced May 1, 2014 and expired April 30, 2015, with a monthly rent of $1,625.00.

14.     Plaintiff's original lease is annexed as Exhibit A.

15.     When Plaintiff moved in, there were poor conditions in the apartment: the walls needed to be painted and plastered; the floor tiles were coming off the sub-flooring; the bathtub was old, chipped, stained and needed to be re-glazed; the shower head and head holder would fall out of the socket; the toilet seat would detach from the toilet; the kitchen cabinets had mold in them; and the oven did not function.

16.     When Plaintiff moved in, SM and its superintendent told her that she needed to pay them "a gift" if she wanted them to fix anything or offer her a better apartment.

17.     Plaintiff reluctantly paid SM an additional $800.00 and its superintendent an additional $200.00.

18.     When the superintendent got upset and said that $200.00 was not enough, Plaintiff gave him another $500.00.

19.     In total, Plaintiff paid $1,500.00 for that initial "gift" to obtain repairs.

20.     Despite the "gift," SM failed to make adequate repairs or offer Plaintiff an apartment in better condition.

21.     Terrible conditions exist in Plaintiff's apartment to this day.

22.     In April 2017, New York City Department of Housing Preservation and Development

(HPD) issued violations against SM for the conditions in and around Plaintiff's apartment, including: one class A violation; 17 class B violations; and one class C violation.

23. SM failed to offer Plaintiff a rent stabilized renewal lease after her original lease expired in April 2015.

24. As of March 2016, Plaintiff had still not received a renewal lease (which she was entitled to under the rent stabilization laws) despite many requests for one.

25. In March 2016, anxious about not receiving a renewal lease, about the conditions in her apartment, and SM's refusal to address her concerns, Plaintiff hired a private attorney who sent SM a letter requesting, *inter alia*, a valid renewal lease.

26. In April 2016, SM provided Plaintiff with a renewal lease.

27. Shortly after receiving the lease in April 2016, SM's managing agent Chaim Englander told Plaintiff he was upset that she obtained an attorney, she was causing trouble and he would evict her with a claim for non-payment of rent.

28. When Plaintiff replied that she was not behind on rent, SM (Chaim Englander) told her that she paid in cash; had no proof; and that a court would believe him (a landlord) over her (a single woman).

29. In June 2016, CHEPT initiated a landlord-tenant eviction proceeding against Plaintiff, on SM's behalf, based on a false allegation of nonpayment of rent.

30. CHEPT regularly sues tenants in New York City Housing Court based on allegations that tenants defaulted on their obligations to pay rent.

31. Accordingly, CHEPT is, *inter alia*, a debt collection law firm.

32. CHEPT prepared a rent demand on SM's behalf, dated June 16, 2016 (the demand).

33. The demand is attached as Exhibit B.

34. The demand claims Plaintiff owed $1,735.00 in arrears, specifically broken down as $1,625.00 for June rent and $110.00 for May rent, and threatens eviction if such sums are not paid.

35. The demand contains no additional rent ledger or breakdown.

36. CHEPT subsequently prepared a petition on SM's behalf, dated July 19, 2016 (the petition).

37. The petition is attached as Exhibit C.

38. The petition alleges $3,260.00 in rental arrears, broken down as: $110 for May 2016 rent; $1,625.00 for June 2016 rent; $1,625.00 for July 2016 rent; and $260.00 for attorney's fees.

39. The rent demand and petition are both false.

40. Plaintiff did not owe any back rent--she had even paid June and July rent with earmarked checks that SM had cashed on June 14 and July 7, 2016, respectively, and before CHEPT prepared the June 16, 2016 rent demand and the July 19, 2016 petition.

41. In addition, Plaintiff did not owe CHEPT attorney's fees.

42. Plaintiff's original rent stabilized lease (Exhibit A) does not allow for attorney's fees in nonpayment proceedings.

43. On information and belief, CHEPT seeks attorney's fees as a matter of routine course in nonpayment proceedings, without respect to whether the underlying lease actually provides for attorney's fees.

44. Moreover, on information and belief, CHEPT and SM never served Plaintiff with either the rent demand or the petition.

45. The affidavits of service for the rent demand and petition both allege conspicuous service

with two prior attempts and additional service by mail and certified mail.

46. However, Plaintiff never received the rent demand or the petition, either affixed to her door, in the mail or by certified mail.

47. Because Plaintiff was never served, Plaintiff only discovered the existence of SM and CHEPT's non-payment lawsuit in August 2016 when she received a postcard from the Court.

48. After appearing in the proceeding once *pro se,* Plaintiff retained counsel in October 2016.

49. With counsel, Plaintiff filed a motion to dismiss non-payment the proceeding, arguing the rent demand (a requisite predicate notice in a nonpayment proceeding) was defective and that the alleged arrears were paid.

50. In December 2016, CHEPT served opposition papers and cross-moved to amend its petition, seeking $8,235.00 in alleged arrears (including $1,625.00 for putative November, October, September, August, and March 2016 arrears, plus $110 for July 2014 through April 2016 arrears where Plaintiff allegedly paid $1,620 a month instead of $1,625.00).

51. A copy of SM's ledger, attached to CHEPT's December 2016 motion to amend, is attached as Exhibit D.

52. CHEPT served the opposition papers and cross-motion by mail directly on Plaintiff, despite knowing she was represented by counsel, in violation of New York's Rules of Professional Conduct 4.2(a).

53. Like the rent demand and the petition, the accounting in CHEPTs motion to amend the petition is plainly false.

54. The accounting in the ledger (Exhibit D) is false because Plaintiff paid November and October 2016 rent in court with checks earmarked for those months.

55.     SM cashed those checks (for November and October rent) before CHEPT dated and served the December cross-motion to amend.

56.     In addition, Plaintiff paid her August, September and March rent with cash, yet never received a receipt.

57.     Further, the ledger annexed to the motion to amend (Exhibit D) reflects that only $1,735.00 was allegedly owed at the time the original petition was filed.

58.     In other words, the original petition (Exhibit C—dated July 19, 2016) seeking $3,620.00 (alleging arrears for July, June and May, plus fees) is demonstrably false, based on CHEPT and SM's own records (Exhibit D).

59.     Moreover, the ledger (Exhibit D) demonstrates that when CHEPT prepared its June 16, 2016 rent demand (Exhibit B) and July 19, 2016 petition (Exhibit C), it affirmatively engaged in a practice called "rent jamming."

60.     "Rent jamming" is a practice where a collector takes a lump sum of alleged arrears, divides by the monthly rent and sends a demand (or petition), claiming the tenant defaulted on a period of current rent (however many months)—often in complete disregard for when the arrears actually accrued (if any), or even if the tenant actually paid rent during the months alleged with earmarked checks.

61.     Upon information and belief, CHEPT "rent jams" (as defined above) intentionally and as a matter of routine practice.

62.     Indeed, "rent jamming" is commonplace in New York City Housing Court.

63.     Housing Court Judge Michael J. Pinkney commented on the practice in the decision Shimon Realty Inc v. Stosko, 6/24/02 N.Y.L.J. 24, col. 6 (Civ. Ct. King Cty. 2002), noting that

7

"[i]t is not uncommon for tenants to come to court after service of the petition with receipts in hand to show payments for the months in the petition, only to be told that the actual arrears are for a different period of time."

64. "Rent jamming" is materially misleading for a number of reasons. By way of example and not limitation, "rent jamming" can confuse tenants in situations with rent subsidy payments.

65. In addition, "rent-jamming" conceals viable defenses such as laches.

66. The practice is additionally deceptive in a situation like Plaintiff's, where a demand is sent shortly after payment is tendered. The tenant can be lured into ignoring the demand, believing the alleged default has already been cured.

67. Along the same lines, there are spoliation of evidence issues. If a tenant needs to prove that she paid money during a specific period of time, it is important to know as soon as possible what the relevant period actually is, lest evidence of such payment be lost.

68. Further, in this age of tenant blacklisting, tenants have an increased interest in being offered fair opportunities to resolve claims pre litigation (a fundamental purpose of a rent demand).

69. Finally, routine rent-jamming reveals, at best, lack of meaningful attorney review. Regardless of the facts of a case, CHEPT (and many other other firms) simply takes their client's sum of alleged arrears, divides by the monthly rent, sends a demand for that amount and then leaves it to the tenants and to the courts to hash out inaccuracies after litigation has already begun. Accordingly, "rent jamming" imposes costs and burdens on the entire court system.

70. CHEPT was clearly "rent jamming" when it prepared the demand for so-called June rent (Exhibit B), disregarding that June rent had already been paid (and cashed) with an earmarked check.

71.     CHEPT was clearly "rent jamming" when it prepared the petition for so-called June and July rent (Exhibit C), disregarding that June and July rent had already been paid (and cashed) with earmarked checks.

72.     The Housing Court denied Plaintiff's motion to dismiss, reasoning that a rent demand need not be entirely accurate and that there is a fact issue as to whether some of Plaintiff's cash payments were received, given that SM alleged an earlier balance of $1,735.00 (supposedly deriving from a missed payment in March 2016, plus a small running balance of $110, Exhibit D).

73.     Plaintiff subsequently filed a motion to amend her Answer, continuing to deny the claim for non-payment of rent, and also raising a counterclaim of overcharge in excess of the legal regulated rent pursuant to the rent stabilization laws.

74.     Plaintiff discovered the overcharge claim during preparations for trial, originally scheduled for May 16, 2016.

75.     SM subsequently substituted attorneys from CHEPT with the law firm Kucker & Bruh, LLP.

76.     The nonpayment proceeding is ongoing and the next court date is scheduled for June 16, 2017.

77.     Plaintiff is the type of vulnerable consumer the FDCPA is designed to protect.

78.     Plaintiff suffered damages inflicted by Defendants' conduct.

79.     Plaintiff was extremely distressed when she discovered SM was suing her in a landlord-tenant proceeding—*i.e.*, trying to evict her—and that CHEPT was claiming in public legal filings that she had not made payments for June and July 2016 rent, which she knew she had. She was upset because the claims are false. She was distressed and fearful of imminent eviction. The

9

obscurity and complexity of Defendants' allegations, combined with the prejudice of defending a proceeding without having been served a predicate notice or the operative pleadings, made Plaintiff especially distressed and overwhelmed. In addition, the lack of service of the rent demand (a requisite predicate notice) deprived Plaintiff an opportunity to address Defendants' claim before litigation began, exposing her to adverse credit reporting consequences and to being blacklisted by tenant screening bureaus.

80. In addition, even though the claims against her were not true, Plaintiff felt like she could not defend herself adequately, especially given that she is not a native English speaker. She worried about being able to afford an attorney. When she did find an attorney, her attorneys made a motion to dismiss—only to later discover that Defendants were actually claiming arrears from a different period than what was alleged in the demand and petition. This misdirection delayed the proceeding and interfered with Plaintiff's ability (even with counsel) to confront the Defendants' actual claim at an earlier stage in litigation. One of Plaintiff's employers also terminated her employment because she had taken too much time off to go to court.

81. Defendants' conduct has caused Plaintiff to lose sleep. To this day, Plaintiff is concerned about Defendants' claims. Although she knows she would struggle to find a comparable affordable apartment in New York City, she feels like she would rather move out than pay SM money that it is not owed—and that she has already paid.

### COUNT 1
### VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (AS TO CHEPT ALONE)

82. Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as though set forth fully and at length herein.

83. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because she was alleged to owe a debt.

84. The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because it was allegedly incurred primarily for family, personal or household purposes.

85. Defendant CHEPT is a "debt collector" as defined in 15 U.S.C. § 1692a(6) because it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another, using the instrumentalities of interstate commerce. Upon information and belief, CHEPT regularly sends rent demands to tenants and has filed thousands of landlord-tenant proceedings based on allegations of nonpayment of rent.

86. The actions of CHEPT enumerated in the above Statement of Facts constitute an attempt to collect a debt, or were taken in connection with an attempt to collect a debt, within the meaning of the FDCPA.

87. CHEPT materially violated the following sections of the FDCPA: 15 USC §§ 1692d, 1692e, and 1692f. By way of example and not limitation, CHEPT violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: engaging in conduct the natural consequence of which is to harass, oppress or abuse any person; using false, deceptive or misleading representations or means; misrepresenting the character, amount or legal status of the debt; threatening to take and actually taking an action prohibited by law; using unfair or unconscionable means; serving a pleading directly on a consumer dispute knowing she had counsel and taking or threatening to take action to effect dispossession of property with no present right to do so.

88. More specifically, by way of example and not limitation, CHEPT violated the FDCPA by:

(a) sending a rent demand for putative arrears that are not owed, and that otherwise conceals the time period of the alleged arrears, *i.e.*, "rent-jamming;" (b) filing a petition for putative arrears that are not owed; (c) demanding attorney's fees in the petition when none are allowed; and (d) serving a motion to amend the petition on Plaintiff, despite knowing she was represented by counsel.

89. The FDCPA was enacted to protect the least sophisticated consumer from abusive, deceptive, and unfair treatment by debt collectors. *See Clomon v. Jackson*, 988 F.2d 1314, 1318 (2nd Cir.1993) ("The basic purpose of the least-sophisticated consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd."). Congress recognized that consumers more often than not lack the benefit of counsel and do not know their rights and are vulnerable to bullying tactics by more knowledgeable collectors.

90. Congress designed the FDCPA to be enforced primarily through private parties – such as Plaintiff – acting as private attorneys general. *See* S. Rep. No. 382, 95th Cong., 1st Sess. ("The committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance."); *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("In this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others."). The filing of civil lawsuits not only makes consumers whole, it is the primary way in which debt collectors are incentivized to act lawfully, and honest debt collectors are not competitively disadvantaged.

91. In order to encourage private attorneys general to act, the FDCPA provides for mandatory shifting of attorney's fees.

92. Plaintiff is entitled to and seeks actual damages, statutory damages, and attorney's fees and costs.

## COUNT 2
## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
## (AS TO CHEPT AND SM)

93. Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as though set forth fully and at length herein.

94. New York General Business Law § 349 (the GBL) provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

95. The GBL sets out a three–factor test for consumer fraud including: (1) a consumer oriented transaction; (2) a deceptive act by the defendant; and (3) an injury caused by such deceptive acts. Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25, 623 N.Y.S. 2d 529, 534 (1995).

96. Defendants SM and CHEPT violated the GBL by taking the acts described in the statements of facts above, including, but not limited to: (a) "rent jamming" and (b) seeking attorney's fees when none are allowed.

97. The "rent jamming," and "fee seeking" (the GBL acts) are consumer-oriented because they affect similarly situated consumers, not just Plaintiff.

98. The GBL acts are deceptive and misleading.

99. The GBL acts caused Plaintiff injury.

100. Plaintiff is entitled to and seeks actual damages, treble damages, punitive damages and attorney's fees and costs.

## JURY DEMAND

101. Plaintiff demands trial by jury.

## PRAYER

102. For these reasons, Plaintiff demands judgment against Defendants for the following:

   i. an order enjoining and directing all Defendants to cease violating § 349. *et seq*;

   ii. Statutory damages under 15 U.S.C. § 1692k;

   iii. An order awarding disbursements, costs and attorneys' fees under 15 U.S.C. § 1692k and GBL § 349;

   iv. A judgment for actual, statutory, punitive and exemplary damages;

   v. Prejudgment and post judgment interest as allowed by law;

   vi. Costs of court;

   vii. Prejudgment and post-judgment interest as allowed by law;

   viii. Such other and further relief as to the Court may appear just and proper.

Respectfully submitted,

/s/

Michael Pereira (MP2887), of counsel to
Jeanette Zelhof, Esq.
MFY LEGAL SERVICES, INC.
(soon to be MOBILIZATION FOR JUSTICE)
Attorneys for Plaintiff
100 William Street, 6th Floor
New York, NY 10038
Tel: (212) 417-3864
Fax: (212) 417-3890
Email: mpereira@mfy.org