UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NINO DZGANIYA,

                                    Plaintiff,

          - against -                                    Case No. 1: 17-cv-04525-GHW

COHEN HURKIN EHRENFELD POMERANTZ
& TENENBAUM, LLP AND SIMILIS
MANAGEMENT LLC,

                                    Defendants.

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SIMILIS
MANAGEMENT LLC'S MOTION TO DISMISS (DKT. NO. 40)**

Evan Denerstein (ED3538)
Michael Pereira (MP2887)
of counsel to
Jeanette Zelhof, Esq.
MOBILIZATION FOR JUSTICE, INC
100 William Street, 6th Floor
New York, NY 10038
*Attorneys for Plaintiff*

# Table of Contents

Table of Authorities ................................................................................................... ii

Preliminary Statement ................................................................................................ 1

Statement of Facts and Procedural Background .................................................... 1

Argument ...................................................................................................................... 5

    I.   This Court Has Supplemental Jurisdiction Over Plaintiff's GBL Claims ........ 5

    II.  Plaintiff States a Claim for Defendants' Violation Of GBL 349 ...................... 8

        A.   Rent Jamming and Fee Seeking are Consumer Oriented ........................... 9

            1. Rent Jamming is Consumer Oriented ...................................................... 11

            2. Fee Seeking is Consumer Oriented ........................................................ 15

        B.   Rent Jamming and Fee Seeking are Deceptive Practices ........................... 16

            1. Rent Jamming is Deceptive ...................................................................... 17

            2. Fee Seeking is Deceptive .......................................................................... 22

        C.   Defendants' Conduct Injured Plaintiff ....................................................... 24

Conclusion ....................................................................................................................

i

# TABLE OF AUTHORITIES

**Cases**

*23 Realty Associates v. Teigman,*
   213 A.D.2d 306, 624 N.Y.S.2d 155 (1st Dept. 1995).............................................. 11

*76 W. 86th St. Corp. v. Junas,*
   45 N.Y.S.3d 921 (Civ. Ct. New York Cty. 2017).................................................... 21

*84 Lbr. Co., L.P. v Barringer,*
   110 AD3d 1224, 973 NYS2d 820 (App. Div. 3d Dep't 2013) ............................... 15

*134-38 Maple St. Realty Corp. v. Medina,*
   3 Misc.3d 134(A), 787 N.Y.S.2d 682 (App. Term 2004)....................................... 20

*270 E. 95 Properties, LLC v. Kent,*
   49 Misc.3d 33, 18 N.Y.S.3d 260............................................................................. 22

*4220 Broadway Associates v. Perez,*
   187 Misc.2d 602, 723 N.Y.S.2d 816 (App. Term 1st Dep't 2000)........................ 22

*8206 Third Ave. Realty LLC v. Resto,*
   54 Misc.3d 1202(A), 50 N.Y.S.3d 24 (N.Y. Civ. Ct. 2016).................................. 20

*Arias v Gutman, Mintz, Baker & Sonnenfeldt LLP,*
   16-2165-CV, 2017 WL 5330081 (2d Cir. Nov. 14, 2017) .............................. 16, 20

*Ashcroft v Iqbal,*
   556 US 662 (2009)..................................................................................................... 8

*ATSI Communications, Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007)........................................................................................ 9

*Austin v. Town of Farmington,*
   826 F.3d 622 (2d Cir. 2016)...................................................................................... 8

*Blue Cross and Blue Shield of New Jersey, Inc. v Philip Morris, Inc.,*
   178 F.Supp.2d 198 (E.D.N.Y. 2001) ...................................................................... 10

*Buyers and Renters United to Save Harlem v. Pinnacle Group N.Y. LLC,*
   575 F.Supp.2d 499 (S.D.N.Y. 2008).................................................................. 10, 19

*Charron v. Pinnacle Grp. N.Y. LLC,*
   269 F.R.D. 221 (S.D.N.Y. 2010) ......................................................................... 5, 8

*City of New York v Smokes-Spirits.Com, Inc.*,
   12 N.Y.3d 616, 883 N.Y.S.2d 772 (2009) ................................................................ 9

*Clayton v Katz*, 10 CIV. 5755 ALC,
   2012 WL 4378035 (S.D.N.Y. Sept. 25, 2012) ........................................................ 10

*Clomon v. Jackson*,
   988 F.Supp.2d 1314 (2d Cir. 1993) ........................................................................ 19

*Diaz v Portfolio Recovery Assoc., LLC*, 10 CV 3920 MKB CLP,
   2012 WL 1882976 (E.D.N.Y. May 24, 2012) ......................................................... 11

*Dwyer v. Mazzola*,
   171 A.D.2d 726, 567 N.Y.S.2d 281 (App. Div. 2d Dep't 1991) ............................ 18

*Frazier v. Priest*,
   141 Misc.2d 775, 534 N.Y.S.2d 846 (City Ct. Jefferson Co. 1988) ....................... 11

*Fritz v. Resurgent Capital Services, LP*,
   955 F.Supp.2d 163 (E.D.N.Y. 2013) ................................................. 5, 10, 11, 24, 25

*Gomez-Jimenez v New York Law School*,
   103 A.D.3d 13, 956 N.Y.S.2d 54 (App. Div. 1st Dept 2012) ................................. 12

*Graham Court Owner's Corp. v. Taylor*,
   115 A.D.3d 50, 978 N.Y.S.2d 213 (App. Div. 1st Dep't 2014) .............................. 23

*Grecco v. Associated Press*,
   No. 16-CV-6240 (VEC), 2017 WL 2913501 (S.D.N.Y. July 7, 2017) ..................... 6

*Harris v. Timecraft Industries, Inc.*,
   132 Misc.2d 386, 503 N.Y.S.2d 987 (Civ. Ct. N.Y. Cty. 1986) ............................. 23

*In re Sling Media Slingbox Adv. Litig.*,
   202 F.Supp.3d 352 (SDNY 2016) .......................................................................... 16

*Jacobs v. Castillo*,
   612 F.Supp.2d  (S.D.N.Y. 2009) .......................................................................... 5, 7

*Kirschner v. Klemons*,
   225 F.3d 227 (2nd Cir. 2000) ................................................................................... 6

*Koch v. Greenberg*,
   14 F.Supp.3d 247 (S.D.N.Y 2014) ......................................................................... 10

*Koch v. Greenberg,*
    626 Fed Appx 335 (2d Cir. 2015) ............................................................ 9

*Lautman v. 2800 Coyle St.,*
    No. 13-CV-967 ARR VVP, 2014 WL 2200909 (E.D.N.Y. May 23, 2014) ........................ 7, 14

*London Terrace Gardens v. Stevens,*
    159 Misc.2d 542, 605 N.Y.S.2d 814 (Civ. Ct. N.Y. Cty. 1993) ............................. 23

*Lozano v. Grunberg,*
    195 A.D.2d 308, 600 N.Y.S.2d 43 (App. Div. 1st Dep't 1993) ..................... 8, 11, 17

*Meyerson v Prime Realty Services,* LLC,
    7 Misc.3d 911, 796 N.Y.S.2d 848 (Sup. Ct. N.Y. Cty. 2005) ........................... 11, 15

*Midland Funding, LLC v Giraldo,*
    39 Misc.3d 936, 961 N.Y.S.2d 743 (Nassau Cty. Dist. Ct. 2013) ........................... 11

*N. State Autobahn, Inc. v. Progressive Ins. Group Co.,*
    102 A.D.3d 5, 953 N.Y.S.2d 96, (App. Div. 2d Dep't 2012) ................................. 10

*Nick's Garage, Inc. v Nationwide Mut. Ins. Co.,*
    101 F.Supp.3d 185(N.D.N.Y. 2015) ....................................................... 15

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,*
    85 N.Y.2d 20, 623 N.Y.S.2d 529 (1995) ......................................... 9, 10, 11, 16

*Riordan v. Nationwide Mut. Fire Ins. Co.,*
    977 F.Supp.2d 47 (2d Cir.1992) ........................................................... 15

*Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP,*
    163 F.Supp.3d 109 (S.D.N.Y. 2016) ............................................ 5, 11, 15, 24, 25

*Shimon Realty Inc. v. Stosko,*
    6/24/02 N.Y.L.J. 24 ...................................................................... 13

*Silber v. Schwartzman,*
    150 Misc.2d 1, 575 N.Y.S.2d 226 (App. Term 1st Dep't 1991) ............................. 22

*St. James Court L.L.C. v. Booker,*
    176 Misc.2d 693, 673 N.Y.S. 2d 821 (N.Y. Civ. Ct. Kings Cty. 1998) .................... 18

*Stutman v. Chem. Bank,*
    95 N.Y.2d 24, 709 N.Y.S.2d 892 (2000) ................................................... 24

*Sykes v. Mel Harris & Assocs., LLC,*
   285 F.R.D. 279 (S.D.N.Y. 2012) ............................................................................. 5

*Sykes v. Mel Harris & Assocs., LLC,*
   757 F.Supp.2d 413 (S.D.N.Y. 2010)................................................................... 5, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)........................................................................................... 9

*Teller v. Bill Hayes, Ltd.,*
   213 A.D.2d 141 (2d Dep't 1995)....................................................................... 10

*Travieso v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.,*
   No. 94 CV 5756 (JBW), 1995 WL 704778 (E.D.N.Y. Nov. 16, 1995)................ 5, 6, 8, 10, 17

*United Mine Workers of America v. Gibbs,*
   383 U.S. 715 (1966)........................................................................................... 5

**Statutes**
28 U.S.C. § 1367 ................................................................................................. 5

28 U.S.C. § 1367(c) ......................................................................................... 5, 7

N.Y. G.B.L. § 349 (GBL) ............................................................................... *passim*

**Rules**
Fed. R. Civ. P. 12(b)(1) ....................................................................................... 1

Fed. R. Civ. P. 12(b)(6)...................................................................................... 1, 6

## PRELIMINARY STATEMENT

Plaintiff Nino Dzganiya, by her counsel, submits this memorandum of law in opposition to the motion by Similis Management LLC (Similis or Defendant) pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss Plaintiff's second cause of action in the First Amended Complaint under New York General Business Law § 349 (GBL). Similis moves to dismiss based on the grounds that this Court should decline supplemental jurisdiction over Plaintiff's state law claim and that Plaintiff fails to state a claim. Similis' arguments fail as a matter of law because: Plaintiff's federal Fair Debt Collection Practices claims against Defendant Cohen Hurkin Ehrenfeld Pomerantz & Tenenbaum LLP (CHEPT) and her GBL claims against both Similis and CHEPT arise from the same exact nucleus of facts; and Plaintiff's First Amended Complaint alleges specific facts sufficient to state a claim under the GBL.

## STATEMENT OF FACTS

The following facts come from Plaintiff's live complaint, Docket Number 32. (FAC.) Plaintiff is a Georgian immigrant who works as a caregiver for children. Similis is Plaintiff's landlord. (FAC ¶¶ 11-12.) Similis owns at least two residential buildings in Manhattan, which contain 73 units, all of which, or nearly all of which, are rent stabilized. (FAC ¶ 46.) CHEPT is a law firm that represented Similis in a New York City Housing Court non-payment eviction proceeding (non-pay) against Plaintiff. (FAC ¶¶ 32, 36.) Upon information and belief, and a review of public records, CHEPT regularly sends rent demands to tenants and files thousands of landlord-tenant proceedings based on allegations of nonpayment of rent. (FAC ¶ 8, 58.)

Both Defendants used false statements and coercive tactics against Plaintiff in the non-pay. (FAC ¶¶ 29-105.) The tactics included: (a) sending a rent demand and petition for putative arrears that were not owed, and that otherwise concealed the time period of the alleged arrears,

*i.e.*, "rent-jamming" (FAC ¶¶ 32-40, 64-66, 68-100); and (b) demanding attorney's fees in the non-pay petition when none were allowed, *i.e.*, "fee-seeking." (FAC ¶¶ 38-39, 41-58.)  These two acts—rent jamming and fee seeking—form the basis of the FDCPA claims against CHEPT (FAC ¶¶ 111-121) and the GBL claims against Similis and CHEPT. (FAC ¶¶ 122-130.)

*(a) Rent Jamming*

Plaintiff defines rent jamming as the common "practice where a collector takes a lump sum of alleged arrears, divides by the monthly rent and sends a demand (or petition), claiming the tenant defaulted on a period of current rent (however many months)—often in complete disregard for when the arrears actually accrued (if any), or even if the tenant actually paid rent during the months alleged with earmarked checks." (FAC ¶ 75-78.)

Similis and CHEPT engaged in rent jamming when they sent Plaintiff a demand, dated June 16, 2016, seeking payment for June 2016 rent. (FAC ¶¶ 32-34.) She had already paid her June 2016 rent with an earmarked check that Similis had already cashed as of June 14, 2016. (FAC ¶ 40.) Similis itself produced a rent breakdown in December 2016, which confirms that it received payment for the June 2016 rent. (FAC ¶¶ 65-74.) In other words, even assuming that Plaintiff owed some arrears, Similis' own documents reveal that she did not owe June rent. *Id*.

In addition, Similis and CHEPT engaged in rent jamming when they sent Plaintiff a petition, dated July 19, 2016, seeking payment for June and July 2016 rent. (FAC ¶¶ 36-40.) She had already paid June and July 2016 rent with earmarked checks that Similis had already cashed on June 14, 2016 and July 7, 2016, respectively. (FAC ¶ 40.) Similis itself produced a rent breakdown in December 2016 that confirms that it received payment for the June and July 2016 rent. (FAC ¶¶ 65-74 and Exh. D.) Again, even assuming Plaintiff owed some arrears, Similis' records stated that she did not owe June or July rent. The petition also claimed that Plaintiff

owed *$3,260.00*, broken down as $1,625.00 for June rent; $1,625.00 for July rent; $110.00 for

May rent, plus $260.00 for attorney's fees. (FAC ¶ 38.) However, Similis' own records

demonstrate that Plaintiff owed at most $1,735.00 as of July 2016, none of which accrued in

June or July. (FAC ¶¶ 65-74 and Exh. D.)

   According to public records, Similis has filed at least 96 cases, the vast majority of which

are non-pays. (FAC ¶¶ 79-80.) Plaintiff's counsel reviewed the files of the six most recent cases,

the only ones immediately available for review. (FAC ¶ 81.) In each of the six cases, Similis was

represented by CHEPT, the tenants were unrepresented at the outset, and the petition followed a

"rent-jamming" pattern wherein the alleged arrears derived only from the most recent months.

(FAC ¶¶ 81-84.) Upon information and belief, and based on a review of public records, Similis

routinely (and perhaps always) files non-pays through CHEPT. (FAC ¶¶ 80-82.) CHEPT appears

to routinely engage in rent jamming. (FAC ¶¶ 87-88.) In addition to the six cases discussed

above, CHEPT engaged in rent jamming in another case, in which it sent a demand in August

2016, seeking alleged arrears for *September*, August and July 2016. (FAC ¶ 88.) It was not

possible for that tenant to owe September 2016 rent as of August 2016. (FAC ¶ 88.)

   Similis has admitted that Plaintiff's definition of rent jamming describes its routine

business practice. In an affidavit filed in the non-pay against Plaintiff, Similis' managing agent

stated that he commenced the proceeding "by appl[ying] payments made to the oldest arrears and

open balances" pursuant to "a typical and accepted accounting principle." (FAC ¶ 85.) In its

instant motion to dismiss, Similis repeats this admission, stating its practice is to apply

"payments to the oldest outstanding obligation," ignoring any concern that tenants, like Plaintiff,

who earmark payments for specific periods, might be confused and subsequently injured by the

practice. (Docket No. 40-9, Similis' Memorandum of Law (Similis MOL, pp. 3, 20-21.))

*(b) Fee Seeking*

In their petition, Similis and CHEPT demanded $260.00 in legal fees from Plaintiff (FAC ¶ 38.) They claimed these fees were "additional rent." (FAC, Exh. C.)  However, they had no right to claim such fees from a rent-stabilized tenant like Plaintiff (FAC ¶ 38). Plaintiff's rent stabilized lease with Similis is a standard "Blumberg" form lease. (FAC ¶¶ 44-45.) As explained in the sections below, as a matter of law, landlords of rent stabilized apartments cannot recover attorney's fees as "added rent" in nonpayment proceedings. In addition, the terms of Plaintiff's lease simply do not provide for legal fees in the event of a non-pay. (FAC ¶ 44, Ex. A.) Rather, it provides for the recovery of legal fees if the lease is "cancelled" or if the "Landlord takes back the Apartment." (Am. Ex. A, ¶ 16(D)(3).) As explained in the sections below, as a matter of law, neither event happens at the commencement of a non-pay, which is when the fees were demanded from Plaintiff. (FAC ¶ 38.)

Accordingly, there was no lease provision that allowed for legal fees in the non-pay, and certainly none that would have been enforceable against a rent-stabilized tenant like Plaintiff. (FAC ¶ 41, 44.) It was objectively false for Similis and CHEPT to claim Plaintiff owed them $260.00 in legal fees, and/or to represent that Plaintiff needed to pay such an amount to avoid eviction. (FAC ¶ 41, 44.) Similis and CHEPT routinely (perhaps always) seek attorney's fees from rent-stabilized tenants in their non-pay petitions. (FAC ¶¶ 42-57.) In each of the six cases Plaintiff's counsel reviewed, Similis was represented by CHEPT, the tenants were unrepresented, the governing leases were rent-stabilized leases, and Similis and CHEPT filed petitions seeking legal fees. (FAC ¶¶ 49-54.) Plaintiff's counsel has also reviewed other cases brought by different landlords represented by CHEPT, where CHEPT also sought attorney's fees from rent-stabilized tenants when the leases did not provide for fees. (FAC ¶ 56.)

4

**ARGUMENT**

**I.     THIS COURT HAS SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S GBL CLAIMS**

District courts may exercise supplemental jurisdiction over state claims that "form part of the same case or controversy" as a federal claim under 28 U.S.C. § 1367. State and federal claims constitute the same case or controversy when they share a "common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966). When state and federal claims share a common nucleus of fact, forming the same case or controversy, supplemental jurisdiction is mandatory, except under limited conditions enumerated in § 1367(c), where courts have discretion whether or not to exercise jurisdiction over the state claims. *Jacobs v. Castillo*, 612 F.Supp.2d 368 (S.D.N.Y. 2009).

Courts routinely exercise supplemental jurisdiction in cases like this, where a deceptive practice forms the basis for both an FDCPA and a GBL claim. *See, e.g., Sykes v. Mel Harris & Assocs., LLC*, 757 F.Supp.2d 413, 428 (S.D.N.Y. 2010)*; Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279 (S.D.N.Y. 2012), *affirmed Sykes v. Mel Harris & Assocs., LLC*, 780 F.Supp.3d 70 (2d Cir. 2015)*; Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, 163 F.Supp.3d 109, 115 (S.D.N.Y. 2016); *Fritz v. Resurgent Capital Services, LP*, 955 F.Supp.2d 163, 173, n.6 (E.D.N.Y. 2013);  and *Travieso v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.*, No. 94 CV 5756 (JBW), 1995 WL 704778, at *7 (E.D.N.Y. Nov. 16, 1995). Supplemental jurisdiction is also common in cases that involve landlord-tenant transactions. *See, e.g., Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 239 (S.D.N.Y. 2010).

Accordingly, this Court has supplemental jurisdiction over Plaintiff's GBL claims. They are based on the same exact acts—namely "rent jamming" and "fee seeking" in Plaintiff's case and in others—that support many of Plaintiff's FDCPA claims. In other words, there is an

inseparable "common nucleus of operative facts" underlying both the GBL and many of the FDCPA claims.

In its motion to dismiss, Similis argues incorrectly that there is no supplemental jurisdiction because the FDCPA claims and GBL claims have different elements: e.g. stating "the nature of the intent and conduct alleged to result in the incorrect rent demand which is required to support the FDCPA claim differs materially from that which is required to support the GBL §349 claim." (Similis MOL, p. 11.) Similis further fails to understand that single acts, such as rent jamming and fee seeking can support more than one claim for legal relief.  Similis' attempts to discredit the relevance of the cases referenced by Plaintiff are similarly misguided. First, it is immaterial to the supplemental jurisdiction analysis that "only *Travieso* was a landlord-tenant case." (Similis MOL, p. 14.)  And it does not matter that the decisions do not contain an explicit discussion of the jurisdictional analysis. (Similis MOL, p. 14.) The reasoning is obvious: each of those courts exercised supplemental jurisdiction over the pendent GBL claims because they were based on the same underlying facts as the FDCPA claims, and thus did not require an analysis of whether supplemental jurisdiction was warranted.  The cases Similis cites to only reinforce Similis' misapplication of the relevant standard. For example, in *Kirschner v. Klemons*, 225 F.Supp.3d 227, 239 (2nd Cir. 2000), the court had no supplemental jurisdiction because the § 1983 claims (based on government officials wrongfully *instituting* disciplinary proceeding claims) had no common nucleus of operative facts with the state law tort claims (based on certain dentists' wrongful "dissemination of confidential information" during those proceedings). In *Grecco v. Associated Press*, No. 16-CV-6240 (VEC), 2017 WL 2913501, at *5 (S.D.N.Y. July 7, 2017), the court had no supplemental jurisdiction over state claims (based on the disputed enforcement of a contractual provision), because they had no common nucleus of

operative facts with the federal copyright infringement claims (based on the alleged "copyright infringement of a single photograph"). None of Similis' cases are analogous to the case at bar, where the state and federal claims arise from the same exact acts—fee seeking and rent jamming— and share an obvious "nucleus of operative facts."

The § 1367(c) discretionary bases for a court to decline to exercise supplemental jurisdiction include instances where: (a) the state claim "raises a novel or complex issue of State law;" (b) the state claim "substantially predominates;" (c) the federal claims are all dismissed; and d) in other "exceptional circumstances." Even in cases in which state claims predominate, it is only appropriate to decline supplemental jurisdiction in extreme circumstances where exercise of jurisdiction would be tantamount to letting "a federal tail" wag "what is in substance a state dog." *Jacobs v. Castillo*, 612 F.Supp.2d at 374-375. The cases that Similis cites for the proposition that this Court should exercise discretion to decline jurisdiction are inapplicable to the circumstances at bar. In *Lautman v. 2800 Coyle St,* No. 13-CV-967 ARR VVP, 2014 WL 2200909, at *8 (E.D.N.Y. May 23, 2014), for example, there was no actual overlap between the facts giving rise, and the parties subject to, a single surviving FDCPA claim and the surviving GBL claims. There, the court exercised discretion to decline supplemental jurisdiction over the surviving GBL claims, which related only to non-attorney defendants and their conduct pre-dating a summary proceeding, which did not overlap at all with an FDCPA claim concerning separate attorney defendants and their conduct *in* the summary proceeding. *Id.* Those facts are distinguishable here, where the GBL and FDCPA claims arise from the same exact conduct, and the GBL claims apply both to the attorney and non-attorney Defendants for the same time period.

Further, there are no discretionary considerations that warrant a decision to decline jurisdiction as argued by Similis. (Similis MOL, p. 11.) This case does not involve a "novel or

complex issue of State law." Indeed, numerous decisions already apply the GBL to collection practices in the landlord-tenant context. *See, e.g., Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. at 239; *Travieso v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.*, at *7; and *Lozano v. Grunberg*, 195 A.D.2d 308, 600 N.Y.S.2d 43 (App. Div. 1st Dep't 1993). In addition, the GBL claims do not predominate. Aside from the parallel FDCPA and GBL claims based on fee seeking and rent jamming, Plaintiff pleads additional claims for violations of the FDCPA, *e.g.,* based on CHEPT sending a pleading to her after it already knew she was represented by counsel. (FAC ¶¶ 67, 117.) It is worth noting that CHEPT did not move to dismiss the FDCPA or GBL claims asserted against it, interposing an answer instead. (Docket Number 33.) Last, there are no "extraordinary circumstances." To the contrary, it would be extraordinarily impractical to litigate the FDCPA and GBL claims against CHEPT in this proceeding, and the same GBL claims against Similis in state court.

Indeed, the case at bar is only analogous to the numerous cases already cited where courts exercised supplemental jurisdiction over GBL claims that arose from the same set of facts as the FDCPA claims. Accordingly, Similis' motion to dismiss for lack of jurisdiction must be denied.

## II.    PLAINTIFF STATES A CLAIM FOR DEFENDANTS' VIOLATION OF GBL 349

For purposes of a 12(b)(6) motion to dismiss, courts must accept the factual allegations in the complaint as true, drawing all reasonable inferences in favor of the pleader. *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016). A complaint will survive a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v Iqbal*, 556 US 662, 678 (2009) (citation omitted). This plausibility requirement is not the same as a probability requirement. *Id*. It merely requires that a plaintiff plead sufficient facts to allow the court to draw a reasonable inference that the defendant is liable

for its conduct. *Id.* In addition, courts must also consider exhibits to the complaint, documents incorporated by reference, and matters of which judicial notice may be taken. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 2007, 551 U.S. 308, 321 (2007); *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

As set forth throughout the complaint, Plaintiff alleges—with specific facts, supported by exhibits and documents incorporated by reference—that Defendants routinely send inaccurate and misleading rent demands and petitions by engaging in a specific practice known as "rent jamming;" and routinely seek attorney's fees from rent-stabilized tenants when none are allowed by law. For the reasons set forth below, these allegations state a claim under the GBL.

GBL § 349 is analyzed under a three-factor test requiring: (1) a consumer oriented transaction; (2) a deceptive act by the defendant; and (3) an injury caused by such deceptive acts. *City of New York v Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621, 883 N.Y.S.2d 772, 776 (2009). As an aside, Similis completely misstates the elements of a GBL claim: the GBL does not "require[] fraudulent intent." (Similis MOL, p.11.) In this case, the Defendants' rent jamming and fee seeking practices meet each element. Their practices are consumer oriented, deceptive and have caused Plaintiff injury. Accordingly, Similis' motion to dismiss must be denied.

## A.  Rent Jamming and Fee Seeking are Consumer Oriented

In order to prevail on a GBL § 349 claim, a plaintiff must meet the first element and show that a defendant's acts or practices potentially "have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25-27, 623 N.Y.S.2d 529, 532 (1995). The consumer-oriented requirement is "broadly interpreted." *Koch v. Greenberg*, 626 Fed Appx 335, 340 (2d Cir. 2015). A plaintiff must only

9

show that the conduct at issue can "*potentially* affect similarly situated consumers." *Id.* (emphasis added). A plaintiff is not required to prove "specific quantifiable harm to the public at large," nor must she "identify specific consumers who suffered pecuniary harm as a result of the allegedly deceptive conduct." *N. State Autobahn, Inc. v. Progressive Ins. Group Co*., 102 A.D.3d 5, 14–15, 953 N.Y.S.2d 96, 103, (App. Div. 2d Dep't 2012).   In determining whether conduct is consumer oriented, "courts may consider the sophistication of the parties  . . . in other words, whether the parties need the protection of the consumer-protection law." *Clayton v Katz*, 10 CIV. 5755 ALC, 2012 WL 4378035, at *5 (S.D.N.Y. Sept. 25, 2012) (citing *Teller v. Bill Hayes, Ltd.,* 213 A.D.2d 141, 147, 149 (2d Dep't 1995)). In the debt collection context, conduct is "consumer oriented" where it is "a normal part of defendants' business," in which case the practice could "have a broad impact on consumers at large." *Fritz,* 955 F.Supp.2d at 173.

Moreover, the GBL was enacted broadly by design "to ensure that the Act would be capable of expanding to counter evolving forms of deceptive conduct." *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc*., 178 F.Supp.2d 198, 231 (E.D.N.Y. 2001). It is designed to allow citizens to act as private attorneys general on behalf of other consumers. *Koch v. Greenberg*, 14 F.Supp.3d 247, 283 (S.D.N.Y 2014). The law is also meant to "afford a practical means of halting consumer frauds at their incipiency without the necessity to wait for the development of persistent frauds." *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 25, 623 N.Y.S.2d at 532 (1995) (quoting Mem. of Governor Rockefeller, 1970 N.Y. Legis. Ann., at 472–473).

Among the "consumer-oriented" economic activities encompassed by the statute are those between landlords and tenants. *See, e.g., Buyers and Renters United to Save Harlem v. Pinnacle Group N.Y. LLC*, 575 F.Supp.2d 499, 512 (S.D.N.Y. 2008) (finding that New York

10

courts give tenants private rights of action against their landlords under GBL § 349); *Travieso*, at

*7 (stating that GBL § 349 applies to landlord-tenant relationship); *Lozano v. Grunberg*, 195

A.D.2d at 308, 600 N.Y.S.2d at 43 (same)*; Meyerson v Prime Realty Services,* LLC, 7 Misc. 3d

911, 921, 796 NYS2d 848, 856–57 (Sup. Ct. N.Y. Cty. 2005) (noting that defendant could not

point to any legislative intent that housing should be exempt from GBL); *Frazier v. Priest*, 141

Misc.2d 775, 534 N.Y.S.2d 846 (City Ct. Jefferson Co.1988) (finding that GBL § 349 applies to

the landlord-tenant relationship); *see also*, *23 Realty Associates v. Teigman*, 213 A.D.2d 306,

624 N.Y.S.2d 155 (1st Dept. 1995) (analyzing New York City housing law, and noting that

tenants are consumers and that the Department of Consumer Affairs has determined that housing

is a legitimate area of interest for consumer protection).

Litigation activity also falls within the ambit of the GBL. *See, e.g., Samms*, 163 F.Supp.3d at

115; *Sykes*, 57 F.Supp.2d at 424, 428; *Fritz*, 955 F.Supp.2d at 173; *Diaz v. Portfolio Recovery

Assoc., LLC*, 10 CV 3920 MKB CLP, 2012 WL 1882976, at *1 (E.D.N.Y. May 24, 2012); and

*Midland Funding, LLC v. Giraldo,* 39 Misc.3d 936, 961 NYS2d 743, 755 (Nassau Cty. Dist. Ct.

2013).  In this case, as explained in more detail below, Similis' rent jamming and fee seeking are

both consumer oriented.[1]

## 1.     Rent Jamming is Consumer Oriented

Defendant Similis argues that sending a rent demand and petition for putative arrears that

are not owed, and/or that otherwise conceal the time period of the alleged arrears, i.e., "rent-

jamming" (which it freely admits it does) is not a consumer-oriented practice that satisfies the

requirement of GBL § 349. (Similis MOL pp. 16-20.) However, if a defendant treats the plaintiff

asserting GBL § 349 the same as it would any consumer in the same situation, that action is not a

---

[1] Although Similis fails to make any legal arguments in its brief as to why the practice of fee seeking is not
deceptive, Plaintiff addresses the argument here anyway.

"single-shot transaction," but instead has the potential to affect the public at large. *Oswego Laborers' Local 214 Pension Fund,* 85 N.Y.2d at 26–27.  Further, when a practice is "part and parcel" of a defendant's business practice, that practice is consumer-oriented. *Gomez-Jimenez v New York Law School*, 103 AD3d 13, 17, 956 NYS2d 54, 58 (App. Div. 1st Dep't 2012).

In this case, Defendants CHEPT and Similis sent a rent demand, dated June 16, 2016, to Plaintiff, despite having cashed her check earmarked for June on June 14, 2016. Defendants CHEPT and Similis also filed a petition on July 19, 2016 claiming July rent due, despite cashing her checks earmarked for July on July 7, 2016. Similis itself later produced a rent breakdown, which confirms that it received payment for the June and July 2016 rent (FAC ¶¶ 65-74.) Both the rent demand and the petition followed the pattern of rent jamming, i.e., Similis calculated a lump sum of alleged arrears, divided it by the monthly rent, and sent a demand and a petition, claiming that Plaintiff defaulted on the most recent months prior to the dates of the demand and petition. The demand and petition inaccurately stated when the arrears allegedly accrued, and ignored the fact that Plaintiff paid the rent during the months alleged with earmarked checks.

Plaintiff's experience is not an isolated incident. Her counsel reviewed Similis' six most recent cases. In each of the cases, Similis was represented by CHEPT, the tenants were unrepresented, and the petition followed a rent-jamming pattern wherein the alleged arrears derived only from the most recent months (with a left over amount allocated to the oldest month). (FAC ¶¶ 81-84.) It is implausible that every single one of these tenants actually defaulted in this same exact pattern. Rather, the pattern of the filings reveals that Similis and CHEPT engaged in rent jamming with these other tenants, as a routine practice, the same as they did with Plaintiff (FAC ¶¶ 79-84).

12

In addition, it is apparent that Similis engages in rent jamming as a matter of course because Similis routinely files non-pays through CHEPT (FAC ¶¶80-82), which has a clear history of rent jamming. (FAC ¶¶ 87-88.) In addition to the Similis cases reviewed, in a CHEPT case filed on behalf of a different landlord, CHEPT sent a demand seeking alleged arrears for September 2016, despite the demand being sent in August 2016. (FAC ¶ 88.) Further, in the underlying non-payment proceeding, Similis' managing agent stated in an affidavit that it commenced the proceeding by "appl[ying] payments made to the oldest arrears and open balances" pursuant to "a typical and accepted accounting principle." (FAC ¶ 85.)  Similis admits in its motion papers that this is its standard business practice. (Similis MOL, pp. 3, 20-21.) As explained in the sections below, and as a matter of law, a landlord may not apply a tenant's earmarked payments to periods other than the intended month. Accordingly, the Similis affidavit in the non-pay (FAC ¶ 85), and the argument it makes in its motion to dismiss (Similis MOL, pp. 3, 20-21) confirm that it fails to apply earmarked payments to the periods that tenants intend. In other words, Similis engages in rent jamming as a matter of routine business. (FAC ¶ 85; Similis MOL, pp. 3, 20-21.) This practice potentially affects every single occupant in Similis' buildings (FAC ¶ 46-48), as any of them could be served with rent demands and/or sued in Housing Court (FAC ¶ 48).

As alleged in the Complaint, rent jamming is a widespread practice that affects tenants at large, not just tenants subject to Similis and CHEPT. (FAC ¶¶ 77-78.) Housing Court Judge Michael J. Pinkney commented on the practice in the decision *Shimon Realty Inc. v. Stosko*, 6/24/02 N.Y.L.J. 24, col. 6 (Civ. Ct. King Cty. 2002), noting that "[i]t is not uncommon for tenants to come to court after service of the petition with receipts in hand to show payments for the months in the petition, only to be told that the actual arrears are for a different period of time"

(FAC ¶ 78). Similis notes this decision is 15 years old. (Similis MOL, p. 3.) Indeed, a decade and a half later, the practice is still widespread, and still affecting people like Plaintiff, who herself showed up to court under threat of eviction, with proof of payments in hand, only to be told that the actual arrears  were for a different period of time. (FAC ¶¶ 77-78, 89-98.)

To support its proposition that Similis' deceptive practices are not consumer oriented, Similis excerpts and relies primarily on the unreported decision, *Lautman v. 2800 Coyle St.*, 2014 WL 2200909. In *Lautman*, the court based its decision to dismiss the *pro se* plaintiff's GBL claim on the fact that he did not "assert that he himself was in any way misled by the allegedly false rent arrears and other charges claimed by defendants in the Housing Court proceedings." *Id.* at *8. The court did not reach the merits of the pre-litigation letters for the jurisdictional reasons discussed above. Notably, *Lautman* does not hold that landlord-tenant transactions, as a rule, are not consumer oriented for the purposes of the GBL.

In this case, unlike in *Lautman*, Plaintiff alleges that Similis' deceptive conduct misled her and interfered with her ability to confront Defendants' actual claim at an earlier stage in the proceeding, resulting in the loss of employment due to missing too many days of work to attend court. Moreover, the unreported *Lautman* decision runs contrary to the myriad of decisions that hold that false or misleading statements in court proceedings may be consumer oriented. *See* cases sited on p. 11, *supra.*

Based on the allegations regarding Plaintiff's case, supported by exhibits attached to the Complaint, her counsel's review of six of the most recent of Similis' 96 filings, which were consistent with a rent-jamming pattern, and Similis' admission that this is its standard practice, Plaintiff plausibly asserts that Similis' practice of rent jamming does and could affect similarly situated consumers and the public at large.

14

## 2.    Fee Seeking Is Consumer Oriented

To the extent Similis argues that routinely demanding attorney's fees in a petition when none are allowed, i.e., "fee seeking," is not a consumer-oriented practice, courts have already ruled that this practice has a "broader impact on the public at large."  *See Samms*, 163 F.Supp.3d at 115 (citation omitted) (internal quotations omitted). In *Meyerson v Prime Realty Services, LLC*, 7 Misc.3d at 921, 796 N.Y.S.2d at 856–57, the New York County Supreme Court denied a landlord defendant's motion to dismiss when the plaintiffs had pleaded that defendants own and manage rent-regulated apartments and used the same forms for all of its lease renewals, thus elevating the transaction beyond a private contract. Indeed, standard form contracts in general have been held to raise what one may characterize as private transactions to the level of deceptive practices aimed at the general public. *See, e.g., Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.Supp.2d 47, 51–53 (2d Cir.1992) (holding that evidence of similar violations of a standard form contract supports a finding GBL § 349 violations); *Nick's Garage, Inc. v Nationwide Mut. Ins. Co.*, 101 F.Supp.3d 185, 197, 2015 WL 1472070 (N.D.N.Y. 2015), affd in part, vacated in part, remanded, 15-1445-CV, 2017 WL 5171217 (2d Cir. Nov. 8, 2017) (same); *84 Lbr. Co., L.P. v Barringer*, 110 A.D.3d 1224, 1227, 973 N.Y.S.2d 820, 824 (App. Div. 3d Dep't 2013) (same).

In this case, Plaintiff has pleaded with particularity that Similis routinely and perhaps always seeks attorney's fees from rent stabilized tenants in its non-pay petitions, which affects similarly situated consumers and thus has a potential impact on the public at large.  (FAC ¶¶ 42-57.) Plaintiff pleaded that Defendant Similis owns at least two residential apartment buildings in

15

Manhattan that contain 73 apartment units. (FAC ¶ 46.)  Based on the facts that Plaintiff's lease

is rent stabilized, and that the building meets the requirements for rent stabilization, Plaintiff

pleaded that, upon information and belief, each of these apartments are rent stabilized. *Id.*

Although Plaintiff cannot obtain Similis' other leases without discovery, Plaintiff pleaded that

her lease is a standard "Blumberg" form lease (FAC Exh. A), and thus it is likely, or at the very

least plausible, that Similis uses the same standard rent-stabilized lease, with the same or similar

terms, for all of its tenants. (FAC ¶ 45.)

        In each of the six cases Plaintiff's counsel reviewed, Similis was represented by CHEPT,

the tenants were unrepresented, Similis had entered into a rent-stabilized lease with the tenant,

and Similis and CHEPT filed a petition seeking legal fees. (FAC ¶¶ 49-54.) Plaintiff's counsel

has also reviewed other cases brought by different landlords represented by CHEPT, where

CHEPT also sought attorney's fees from rent stabilized tenants when the underlying leases did

not provide for fees. (FAC ¶ 56.) Given that Similis was represented by CHEPT in each of the

six cases reviewed, it is reasonable to infer that Similis is always or nearly always represented by

CHEPT. (FAC ¶ 50.) Based on the the above and Plaintiff's facts, it is also reasonable to infer

that Similis routinely seeks attorney's fees when none are allowed by law. The "fee seeking"

tactic (i.e., the false representation) used in Plaintiff's case potentially affects every occupant in

Similis' buildings. (FAC ¶¶ 45-57.) If this is Similis' routine practice, which can only be

determined with certainty by reviewing documents via discovery, then Similis' act of "fee-

seeking" affects similarly situated consumers and the public at large.

**B.      Rent Jamming and Fee Seeking are Deceptive Practices**

        Under the GBL, deceptive acts are defined objectively, as acts "likely to mislead a

reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214*

*Pension Fund*, 85 N.Y.2d at 26, N.Y.S.2d at 533. An act or claim is objectively misleading if it involves information that is likely to affect a consumer's choice or conduct. *In re Sling Media Slingbox Adv. Litig.*, 202 F.Supp.3d 352, 360 (SDNY 2016); *see also Arias v Gutman, Mintz, Baker & Sonnenfeldt LLP*, 16-2165-CV, 2017 WL 5330081, at *6 (2d Cir. Nov. 14, 2017) (finding that debt collector's misrepresentations in a court proceeding were material under the FDCPA because they could "reasonably be expected to affect how or even whether a consumer respond[ed]" to the collector's allegations in court). Courts have found that landlords engage in deceptive acts when they send tenants court papers that contain false and misleading statements. *See Travieso*, 1995 WL 704778, at *3, 7 (finding a claim under the GBL where landlord sent tenants false and misleading rent bills, termination notices and non-payment petitions); and *Lozano*, 195 A.D.2d at 308, 600 N.Y.S.2d at 43 (finding a claim under the GBL where the landlord defendant sent tenants dispossession notices that falsely threatened an ability to immediately evict based on the tenants' alleged non-payment of rent).

In this case, the rent jamming and fee seeking are both deceptive.

## 1.     Rent Jamming Is Deceptive

Rent jamming is materially misleading to consumers/tenants for many reasons. Generally speaking, rent jamming is deceptive because it misrepresents key facts, which impedes a defendant's ability to adequately defend herself in a non-payment proceeding.  Papers that include misrepresentations about the time periods when arrears accrue materially interfere with a reasonable tenant's ability to resolve claims either before litigation begins or soon thereafter; to formulate equitable defenses; and to preserve evidence for the relevant periods.

Rent jamming is particularly deceptive where, as here, a demand is sent shortly after payment is tendered, because the tenant can be lured into ignoring the demand, believing the

alleged default has just been cured. (FAC ¶ 90.) The practice is especially problematic in a fact

pattern like Plaintiff's in which she denies owing the landlord any arrears at all. (FAC ¶¶ 27-28.)

Further, rent jamming allows a landlord to tailor its claims to the strength of the tenant's proof,

particularly (as here), where the landlord relies on a handwritten ledger. Rent jamming is

additionally deceptive because doing so obscures what exactly a landlord is collecting. This can

drag out litigation and pressure tenants into settling disputed claims out of fear of incurring

greater liability, or out of fear of losing their homes. The practice is particularly confusing for

tenants who receive rent subsidy payments, because it is impossible to determine from the

petition whether the landlord is collecting valid rent owed, subsidized portions of the rent (which

is improper), or both. (FAC ¶ 89.)[2]

In addition, by concealing the period when arrears begin to accrue, rent jamming

interferes with a tenant's ability to raise (and prove) equitable defenses such as laches. (FAC ¶

90.) A laches defense is based on delay by the landlord that is prejudicial to the tenant. *Dwyer v.

Mazzola*, 171 A.D.2d 726, 727, 567 N.Y.S.2d 281, 282 (App. Div. 2d Dep't 1991). Rent

jamming hides the delay and, thus, the availability of a defense.[3]  Furthermore, even though a

defense of laches still allows a landlord to obtain a non-possessory judgement (e.g., a money

judgment) for the stale rent, by rent-jamming, the landlord artificially inflates the amount

---

[2] *St. James Court L.L.C. v. Booker*, 176 Misc.2d 693, 673 N.Y.S.2d 821 (N.Y. Civ. Ct. Kings Cty. 1998) illustrates the problem clearly. There, a landlord sent the tenant a rent demand with an unclear rent breakdown, making it difficult for both the tenant (a subsidy recipient) and the subsidy provider itself to determine whether and when the alleged arrears accrued. *Id*. at 694, 822. The court explained: "[w]ithout a clear breakdown, [the tenant] does not know which specific monies are being demanded" and "unless there is a clear and accurate month-by-month breakdown of the rental arrears" it is difficult for the tenant and the subsidy provider to determine who defaulted and/or who, if anyone, is responsible for the remaining arrears. *Id.*
[3] For example, if a tenant thinks a landlord is collecting current rent that she knows she paid, she might simply assert a general denial. However, if the tenant understands that the landlord is seeking stale rent, she is more likely to raise that in an answer at the outset. It becomes more difficult, especially for a *pro se* tenant, if she must amend her pleadings at a later stage.

necessary to avoid a possessory judgment. This may deter a tenant from even seeking to preserve her apartment. It also makes it less likely the tenant will be able to find charity or government assistance, as such aid is typically capped at certain amounts.

By rent jamming, landlords also deny tenants fair opportunities to resolve claims pre-litigation, which would keep them off of tenant blacklists.[4] Given the prevalence and dire consequences of tenant blacklisting, consumers have an interest in resolving claims prior to litigation. (FAC ¶ 93.) By sending a deceptive rent demand, a tenant may be tricked into thinking he or she has already paid the rent claimed due in the rent demand and ignore it, resulting in unnecessary litigation and being placed on a blacklist.

Rent jamming is also deceptive because it can lead to tenants allowing spoliation of evidence of payments for the relevant time period that rent is supposedly owed. (FAC ¶ 92.)

Moreover, rent jamming by and through an attorney—as Similis does with CHEPT—falsely gives the impression to tenants that an attorney has performed a meaningful review of the facts and circumstances, when in reality the attorneys often simply take their client's sum of alleged arrears, divide by the monthly rent, and send a demand or petition—outsourcing the time and cost of reviewing rent ledgers, payment receipts and other relevant information onto tenants and the court system. (FAC ¶¶ 94-96.) *Clomon v. Jackson*, 988 F.Supp.2d 1314, 1321 (2d Cir. 1993) (explaining that "the use of an attorney's signature implies — at least in the absence of language to the contrary — that the attorney signing the letter formed an opinion about how to manage the case of the debtor to whom the letter was sent"). In this case, Similis' misleading accounting delayed the proceeding and interfered with Plaintiff's ability to confront her

---

[4] Tenant blacklisting is a practice where tenant screening bureaus purchase housing court data and use this data to prepare tenant screening reports, which are then sold to and used by prospective landlords, who then blacklist tenants with any history of landlord-tenant litigation, regardless of outcome. *See e.g. Buyers & Renters United to Save Harlem*, 575 F.Supp.2d at n.1.

landlord's claim at an earlier stage in litigation, which resulted in her being fired for taking too much time off to go to court. (FAC ¶ 109.)

Similis argues that rent jamming is not deceptive because landlords are allowed to "apply payments to the oldest arrears and open balances." (Similis MOL, pp. 3, 20-21.) However, "a payment of rent intended for a certain period must be applied to that period; a landlord is not entitled to apply [a] tenant's earmarked checks as it sees fit." *8206 Third Ave. Realty LLC v. Resto*, 54 Misc.3d 1202(A), 50 N.Y.S.3d 24 (N.Y. Civ. Ct. 2016); *see also 134-38 Maple St. Realty Corp. v. Medina*, 3 Misc.3d 134(A), 787 N.Y.S.2d 682 (App. Term 2004) (finding landlord should have applied tenant's checks to the months for which they were earmarked").[5]

Similis' own authority confirms this basic principle that a tenant's payments should *not* be applied to the oldest outstanding amounts when there is an agreement or specification to the contrary. (Similis MOL, p. 21 and cases cited therein.) In this case, Plaintiff earmarked her checks, and therefore her payments should have been credited to the months specified.

In addition, even assuming that a landlord is allowed to apply payments to the oldest arrears when checks are not earmarked based on housing court practice, it is still a deceptive and misleading debt collection tactic to send demands and petitions that do not accurately represent when the arrears first accrued. As explained in *Arias*, 2017 WL 5330081, at *6, misrepresentations like these which can "reasonably be expected to affect how or even whether a consumer responds" to a debt collection attempt, are material misrepresentations within the framework of a consumer protection statute. Further, there are many instances in which a consumer protection statute applies to an unlawful practice even when it is legal in a different

---

[5] Similis simply does not address the fact that tenants, including Plaintiff, often earmark payments for specific periods (FAC ¶ 40), thus it falsely claims a payment was not made during a specific time when it was, which is clearly and objectively deceptive.

context. In *Romea v. Heiberger & Assoc.*, 163 F.Supp.3d 111, 118 (2d. Cir. 1998), the court held that even though the defendant's three-day pre-eviction notices technically complied with housing law, they were still an impermissible means of collecting back rent in contravention of the consumer-protection purposes of the FDCPA. *Id*. Stated plainly, the court held that as long as the application of the FDCPA to the three-day notice requirement did not lead to absurd results, which it did not, housing attorneys were required to comply with both the consumer-protection and housing law statutes.

This case is similar to *Romea*, in which GBL § 349 applies to Similis' practice of sending rent demands and filing nonpayment petitions that obscure facts necessary for consumers to make informed decisions about how to respond to a landlord's allegations of nonpayment of rent. Applying the protections of GBL § 349 to non-payment demands and petitions does not lead to absurd results: it is perfectly reasonable and fair for landlords and their attorneys to provide tenants with an accurate breakdown of alleged rent arrears and the date they actually accrued in rent demands and petitions, and not to outsource doing so onto tenants and the court system. (FAC ¶ 96.) *See also 76 W. 86th St. Corp. v. Junas*, 45 N.Y.S.3d 921, 925 (Civ. Ct. New York Cty. 2017) (discussing why more detailed predicate notices obviate needless litigation and noting that "[i]f requiring the inclusion of supporting facts [in the predicate notice] relieves some of the burden on the court and the public by eliminating speculative or frivolous cases, it will have accomplished a worthwhile result."). It is perfectly reasonable and fair for landlords and their attorneys to provide tenants with an accurate breakdown of alleged rent arrears and the date they accrued in rent demands and petitions.[6]

---

[6] Indeed, they are often required to do so under the individual practice rules of the Housing Court Judge. *See e.g*. Hon. Timmie E. Elsner, *available at* http://www.nycourts.gov/courts/nyc/housing/judge/partrules/telsner.shtml [accessed Nov. 28, 2017] (requiring under rule 7 that "Every stipulation of settlement in a nonpayment proceeding

Similis' argument that Plaintiff fails to plead specific facts demonstrating that its conduct was deceptive ignores the contents of the live complaint. Indeed, Plaintiff pleaded with detail about the fact that the amounts Similis sought, and the time period for which Similis sought rent in the petition and rent demand were false and misleading. (FAC ¶¶ 38-40; 72-73.) Plaintiff pleaded similarly specific facts to demonstrate that Similis makes these same type of false representations to other tenants it sues in non-payment proceedings. (FAC ¶¶ 79-88.) Accordingly, Plaintiff sufficiently shows in her Complaint that rent jamming is a deceptive practice under the standards of the GBL because it is likely to mislead consumer/tenants about material elements of their landlords' claims.

## 2.     Fee Seeking is Deceptive

Seeking attorney's fees in rent demands and petitions also handily meets the deceptive prong of the GBL. As a matter of law, landlords of rent-stabilized apartments can only recover the "legal regulated rent" in nonpayment proceedings (i.e., the lawful regulated contract rent), which does not include any charges for attorney's fees. *270 E. 95 Properties, LLC v. Kent,* 49 Misc.3d 33, 18 N.Y.S.3d 260 (App. Term 2nd, 11th and 13th Dep'ts 2015) (explaining that legal and late fees "cannot be considered rent where an apartment is rent stabilized, even if there is a provision in the lease deeming them additional rent"); *4220 Broadway Associates v. Perez,* 187 Misc.2d 602, 723 N.Y.S.2d 816 (App. Term 1st Dep't 2000) (explaining that attorney's fees are not additional rent in the context of rent-regulated tenancies and may not serve as the predicate for eviction); *Silber v. Schwartzman*, 150 Misc.2d 1, 3, 575 N.Y.S.2d 226, 227 (App. Term 1st Dep't 1991) (holding that in a proceeding for nonpayment of rent by the landlord of a rent-

---

must provide a breakdown of the arrears alleged owed. If the tenant intends to seek assistance from DSS, said breakdown shall contain a listing of the actual months for which the tenant or agency failed to pay rent. A 'first in first out' breakdown will not be accepted.").

stabilized premises, "attorney's fees may not be considered 'rent' or be awarded as 'additional rent' in order to enable [a] landlord to obtain a possessory judgment, and a lease clause to that effect is unenforceable"); *London Terrace Gardens v. Stevens*, 159 Misc.2d 542, 545, 605 N.Y.S.2d 814, 817 (Civ. Ct. N.Y. Cty. 1993) (same). Accordingly, it was a false statement for Similis and CHEPT to claim that Plaintiff, a rent-stabilized tenant, owed attorney's fees as "additional rent" in a nonpayment proceeding. (FAC ¶ 38 and Exh. C.)

In addition, even with unregulated tenancies, or in eviction proceedings for rent-stabilized apartments based on causes of action other than non-payment of rent, legal fees are only recoverable if a lease specifically provides for them. *Graham Court Owner's Corp. v. Taylor*, 115 A.D. 3d 50, 978 N.Y.S. 2d 213 (App. Div. 1st Dep't 2014) (explaining that an attorneys' fees clause in a lease "may be narrowly tailored to permit fees only under certain circumstances, or for particular types of proceedings," whether it is the landlord or the tenant seeking fees, pursuant to the reciprocal right to fees under Real Property Law § 234).

In Plaintiff's case, her lease simply does not provide for legal fees in the event of a non-pay (putting aside that such a provision would be unenforceable). (FAC, Ex. A.) Rather, Plaintiff's lease only provides for the recovery of legal fees in the event that the lease is "cancelled" or the "Landlord takes back the Apartment." (FAC ¶ 44, Ex. A.) As a matter of law, neither event happens at the commencement of a non-pay, which is when the fees were demanded from Plaintiff. (FAC ¶ 38.) *Harris v. Timecraft Industries, Inc.*, 132 Misc.2d 386, 503 N.Y.S.2d 987 (Civ. Ct. N.Y. Cty. 1986) (explaining that non-payment proceedings and so-called holdover proceedings (which are predicated on the termination of a lease) "are mutually exclusive remedies", with "[t]he former acknowledg[ing] the continuation of the tenancy and seek[ing] to enforce its terms" and "[t]he latter require[ing] a prior termination of the tenancy").

23

Accordingly, Similis is wrong that Plaintiff's lease allows it to demand attorney's fees in the non-pay petition, and it is wrong to assert that illegally demanding fees is not deceptive. As in *Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, 163 F.Supp.3d at 116, a false demand for attorney's fees is deceptive under the GBL because it would mislead a reasonable consumer "into believing that there was some basis for the request," and coerce such "reasonable consumer into paying the debt out of fear of incurring even greater liability." It is important to emphasize that virtually all tenants are unrepresented at the petition stage (FAC 58), as was Plaintiff, when they receive these demands for fees. Like the consumer in *Samms,* they might likely believe there is a basis for the request and pay the amount out of fear of incurring even greater liability or of losing their rent stabilized homes. Likewise, they also may pay the amount simply to avoid the cost and inconvenience of going to court and incur lost wages or risk losing a job. For all these reasons, fee seeking is materially deceptive.

## C.      Defendant's Conduct Injured Plaintiff

Similis argues that "there is no factual allegation that the total rent owed by Plaintiff was not in the aggregate amount that was demanded, and thus there is no cognizable injury to the Plaintiff resulting from the landlord's attempt to recover that amount." (Similis MOL, p. 21.) The third element of a GBL claim is an injury caused by the deceptive act "though not necessarily pecuniary harm." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S. 2d 892, 896 (2000). In *Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, the plaintiff stated a claim for injury under the GBL, based on a claim that, as a result of a collection lawsuit, he had "trouble thinking, eating and sleeping and [] had to pay filing fees." 163 F.Supp.3d at 116. In *Fritz v. Resurgent Capital Servs., LP*, 955 F.Supp.2d at 174, the

plaintiff adequately pleaded damages under the GBL by alleging the "time spent and costs incurred" defending meritless collection claims.

Even assuming for the sake of argument that Plaintiff owed Similis some arrears, Plaintiff never owed *$3,260.00*, which was the amount demanded in the July 2016 petition, and which included attorney's fees. (FAC ¶ 38.) Similis' own records demonstrate that Plaintiff owed at most $1,735.00 as of July 2016, none of which accrued in June or July. (FAC ¶¶ 65-74.)

Like the plaintiffs in *Samms* and *Fritz*, Plaintiff adequately pleaded injury under the GBL, based *inter alia* on her: (a) loss of wages due to being terminated because her employer felt she "had taken too much time off to go to court" to confront the non-payment claims; (b) job search expenses following the loss of employment; (c) distress that Similis and CHEPT's false statements could cause her to be evicted from her rent-stabilized apartment; (d) distress that she might have to pay legal fees in order to avoid eviction; (e) distress that Similis and CHEPT were "claiming in public legal filings that she had not made payments for June and July 2016 rent, which she knew she had;" (f) unknown actual damages from potential subjection to adverse credit reporting consequences and/or blacklisting by tenant screening bureaus; (g) anxiety; and (h) lost sleep resulting from the Defendants' false claims. (FAC ¶ 107-110.) Accordingly, Plaintiff adequately pleads an injury caused by Similis' deceptive acts.

## CONCLUSION

The instant motion to dismiss should be denied in its entirety. This Court has supplemental jurisdiction over Plaintiff's GBL claims and Plaintiff has more than adequately stated a claim for relief under the GBL.

November 28, 2017

/s/
Evan Denerstein

25

edenerstein@mfjlegal.org
Michael Pereira
mpereira@mfjlegal.org
of counsel to
Jeanette Zelhof, Esq.
MOBILIZATION FOR JUSTICE, INC
Attorneys for Plaintiff
100 William Street, 6th Floor
New York, NY 10038
Tel: (212) 417-3700
Fax: (212) 417-3890

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2017, I served Plaintiff's' Memorandum of Law in

Opposition to Similis Management LLC's Motion to Dismiss on the following persons via ECF.

Catherine Helwig, Esq.
Abner T. Zelman, Esq.
KUCKER & BRUH, LLP
Attorneys for Defendant Similis Management
LLC
747 Third Avenue, 12th Floor
New York, NY 10017
Tel: (212) 869-5030
CHelwig@KBLLP.com
AZelman@KBLLP.com

Matthew J. Bizarro, Esq.
L'ABBATE, BALKAN, COLAVITA &
CONTINI, L.L.P.
Attorneys for Defendant Cohen, Hurkin,
Ehrenfeld, Pomerantz & Tenenbaum, LLP
1001 Franklin Avenue
Garden City, NY 11530
Tel: (516) 294-8844
Email:MBizzaro@lbcclaw.com

_____/s/_____
Evan Denerstein